Arguments not to exceed 15 minutes per side, Ms. Faulkner for the appellant. Ms. Faulkner. Hi, how are you all? My name is Ms. Faulkner and I represent Jeanne Wallner in regards to claims against her former employer, which I will refer to as Hilliard Lyons throughout my argument, for violations of the Family Medical Leave Act. First of all, Ms. Faulkner, Ms. Wallner requested FMLA to undergo a total knee replacement and her surgeon submitted FMLA paperwork to Hilliard Lyons establishing her need for leave from August 11th to approximately October 11th, 2009. This is not disputed and it's acknowledged by Hilliard Lyons, the Human Resource Director and Manager, Janet Harrison, and Sharon Landgraf. As a result of this FMLA leave, Ms. Wallner brought FMLA interference and retaliation claims against Hilliard Lyons that were improperly and summarily dismissed by the district court. This dismissal should never have occurred based on established precedent that requires all facts to be viewed in a light most favorable to the non-moving party who was Ms. Wallner. Instead of doing that, the district court chose to look at the facts in a separate type basis. He looked at them piecemeal and did not relate events together as a whole, as Hilliard Lyons directed the court to do in their summary judgment motion. Because the defendant did that, it was hard for the court to ultimately understand that what happened to Ms. Wallner during her leave effectively caused not only her ultimate termination but a final written warning upon her return from FMLA leave. For example, in order to understand, let's suppose that, for argument's sake, that Hilliard Lyons' Human Resource Manager, Sharon Landgraf, let's say that she did not send an email to Wallner's supervisor, Denny Morneman, instructing him that Wallner was returning from FMLA leave on September 22nd. Let's suppose that Sharon Landgraf did not demand that Wallner return from FMLA leave on September 22nd. And then let's suppose that Sharon Landgraf did not send a letter to Wallner and to her supervisor saying, Hilliard Lyons is going to extend your FMLA leave from September 22nd to October 2nd. If those things did not occur, there never would have been a final written warning. The final written warning was based on two instances that occurred that were caused by Sharon Landgraf. The final written warning disciplined Ms. Wallner on her return from FMLA leave because of a demand from Sharon Landgraf that she return early from FMLA leave. Ms. Wallner refused to do that. She had every right to refuse to do that. Her doctor said she should be out until October 11th. Was the final warning based on that? Yes. What did the final warning say? The final warning wrote her up for what was deemed abusive or unprofessional behavior during a September 15th phone call when Sharon Landgraf requested her to return to work. And not calling. So that was the first part of the final written warning. The second part was not calling. But the not calling... I understand. I'm trying to get what the final warning was based on. Right. Based on those things. It was final because there had been previous... No. There was one that occurred in January of 2009, about nine months prior to the FMLA leave or prior to her termination. And that warning... What was that based on? That was based on the fact that Ms. Wallner went on vacation, and the day before her vacation, she found out that her plane was leaving a day earlier. So it had nothing to do with tardiness. There were no previous incidents? There was nothing. Her record was clean. She had worked there for 27 years. There was not an evaluation. There was not another write-up in her file. That was it. And not one mention of tardiness previous. Did Mr. Blair rely on things that happened before then? No. The only thing he relies on is that one write-up nine months earlier. I thought you just told us that the final warning was because she did not report during the period of FMLA leave and that she refused to come back during that period. That's not what the warning actually says, is it? Yes. It does? Can you read me the words? I will be glad to, if I can turn to it quickly. I'm sorry, Your Honor. It's in my brief. This is my impression. I have it. Can I do that? The final written warning is being issued to you based on your inappropriate and unprofessional behavior while on leave of absence. On September 15, 2009, you were contacted by Sharon Landgraf regarding information that we had received from the Hartford concerning a possible return to work date for you. During that call, you and members of your family became abusive and rude, using inappropriate language and demonstrating unprofessional behavior. On September 22, Hartford extended your paid medical leave based on additional information provided by your doctor. On that day, two attempts were made to contact you by telephone concerning the approved extension. You were left voicemail messages on that day requesting that you contact Human Resources and or your manager. A letter was also sent to you on September 22, instructing you to remain in contact with your supervisor or manager during this time and to contact Human Resources concerning your medical clearance and return to work. You failed to respond to our request for contact concerning your leave. The only contact you made with Hilliard-Lyons after September 26 was on October 5, at which time you notified us of your return to work on October 6. Unless I'm missing something, the reasons given there are inappropriate, unprofessional conduct and failure to respond. I don't see an express reason in that warning that you're hereby warned that you cannot continue FML leave. I mean, you're reading that into it, are you not? I don't think that I am reading it. Okay, well, where is it actually in the text of that? Because what you read is not in the text. What you've argued to me is not in the text. Well, the whole basis for the final written warning. The basis, okay. The basis, okay. Okay, the text, the words in the warning. It does not use the word FMLA. That's right. Okay, at least the reasons given are something else. Unprofessional, improper conduct, failure to respond, right? That's right. The expressed reasons. You know, it helps us if you're candid with us rather than stretch the facts. Your credibility diminishes quite a bit. The problem with the final written warning is clearly evident in the record that it was related to her FMLA. Okay, related is different than that is the reason given, that's all. To the first issue about the unprofessional conduct, Sharon Landgraf, she called Gene Walner and demanded, and it's in the record, it's not disputed, that she demanded she return to work, okay? And she was written up for that. That's a different issue than what's in the written warning, that's all. And I recognize that. I know that's in the record. Okay. And that's your best argument. Yes. And that's probably what you ought to rely on. Well, and I hope that you understand that. But that final written warning was, to my understanding, based on FMLA. Isn't it true that FMLA doesn't have to be paid? That is correct. FMLA is right. That's right. But you would think most HR people would think that the person who's taking FMLA leave is going to want to have it covered by either short-term disability or something else. I do not disagree with you. So is this. You could just as easily read. You can say it's up to a jury, but you could just as easily read those as saying you need to come back or else you're going to go. Isn't it out there with no pay? Isn't it most people that you're dealing with are going to want to be paid for their FMLA leave? Am I making sense? That wasn't what. I mean, I agree with you that for me, yes, I would want to be paid. Okay. And I'm not saying that Walner didn't want to be paid, but that wasn't the issue. Does your language clearly say you have to come back? Yes. Which part of the language says that? Not in the final written warning, no. I don't mean in the final written warning. In the texts of these, I guess there's some transcribed phone calls. There are transcribed. She says you have to come back by this date. Those happen after this date. So after this. So these are just different characterizations of the same phone call, is that what it is? No. There's multiple phone calls. There's a phone call on September 14th. There's a phone call on September 15th. There's phone calls on September 22nd. This phone call that she got disciplined for was on September 15th. There were phone calls that came in on September 22nd, the day that she was, I guess, that Ms. Landgraf wanted her to come back to work, that said that you have an extension of, we've heard from the Hartford, there's an extension. On that same day, Sharon Landgraf sent a letter out to Ms. Walner that said, Hilliard-Lyons is extending your FMLA leave. Okay. And you're to be back to work now by October 2nd. That wasn't the day she was to return from FMLA. But it was the day that her short-term dis- That was the day when the money ran out, though. That is, but that's not her FMLA. And the problem is that Sharon Landgraf gave that information to Ms. Walner's supervisor. She gave the return date of September 22nd to him. She gave a return date of October 2nd, and never cleared that up, never let him know that those dates were incorrect, that they were erroneous the whole time. So there's an ill will. There's an animosity. There's anger that she's not back. There's a three-person department that she worked in, and as Mr. Mormon stated in his deposition, when one of them's gone, that's 33% of the workforce not there. How much FMLA time was she entitled to that she did not get? Five days. Five days. And why was she entitled to those extra five days? Well, the doctor, if you're like in Culpeper, when we're looking at what the doctor wrote on the FMLA form, okay, it said she was supposed to have her FMLA from August 11th through approximately October 11th. Now, after these events occurred with Sharon Landgraf, Ms. Walner went to Arizona, where her daughter is a licensed physical therapist and did extensive therapy. She came back to the doctor, and he released her early to come back to work. Okay, so she ultimately was granted all the FMLA time that she wanted at the end, right? That is correct. So how do you have an interference claim? I have an interference claim because the whole time she was off on FMLA, Ms. Landgraf interfered with her claim. Well, but don't we look at the ultimate result? If the employer ultimately grants the FMLA time requested, even if it was, you know, like pulling teeth, if it is ultimately granted, I fail to see how you have damages for interference. Well, if you look at it just separately, as the district court did, if you look at just the fact that she went on leave, she came back from leave. I agree with you. What else do you do? If you concede that she was only entitled to leave until October 5th or 6th, whatever the date is, and that's what she got, how do you get extra time when you concede that it's not supported? Well, I think that if you look at your case that you authored in Seeger v. Cincinnati Bell, I think it's very clear that it's not that the FMLA substantive rights allow an individual like Walner to go on leave without being harassed, without suffering, you know, animosity being created against them while they're on leave by the human resources manager. The case that you based that on, I think, was Stallings v. Hussman. And in that case, they gave three things that they looked at, and one was, was there anybody who impeded the FMLA? There was in this case, and she was a decision maker. So you've got two claims. You've got a retaliation claim, which I think is your stronger claim, and you've got the interference claim. I view them separately. I guess for the interference, you're saying, even though you have no out-of-pocket damages, you have no monetary damages, no special damages, you nevertheless can recover mental anguish damages or non-economic damages even though there is no FMLA monetary? Is that the argument? Because that's quite a novel position, I think. I think the argument is that if the interference caused for FMLA. No, no. No, no, no, no, I do not. I don't think that the FMLA allows for mental anguish. Well, what else do you have other than non-economic damages for the interference? Well, the interference caused her to lose her job. No, that's retaliation. It's both. I do not believe that you're holding, and Seeger v. Cincinnati Bell said, that you can't have an interference claim when there is a discharge. I don't read it that way, and maybe I'm incorrect. But you clearly stated in that case that in a discharge theory that you can have an interference claim. You can have a retaliation claim. And I believe that there is interference here that created a situation when you build the facts on top of each other. The ultimate thing that happened was that she lost her job. That was a huge blow to her detrimentally. Thank you. I'm sorry. No problem. Thank you. I think it would be wise to focus first on the retaliation claim. Thank you, Your Honor. This case involves an employee that received oral and written warnings for misconduct, tardiness, unexcused absences, months before the FMLA leave had issued. There's only one that was before she went on this leave, and that had to do with a change in flight times. Is that accurate? It is not, Your Honor. In the record? Yes, Your Honor. From the plaintiff's deposition that Mr. Moorman, her supervisor, orally instructed her, hey, can't you come to work on time a little bit better? Then about a year later, there was this written warning in January 2009 which was based not only on a same-day request, unexcused, unscheduled absence, but also chronic. That happens when you change your airplane tickets sometimes, right? Excuse me, Your Honor. Sometimes you have changes in air flights that require that you leave a little early. That's correct, Your Honor, but there are still consequences under attendance policies for those. Even though it was granted? Pardon me, Your Honor. Even though it was granted, there are still consequences? You go to your boss and say, can I leave early? The flight time has changed. The boss says yes. That's a negative in your shop? Well, Your Honor, in that case, I mean, Mr. Moorman. Mr. Moorman really didn't have a choice. I mean, if he was to say, you can't go, she had already scheduled this vacation, she had booked the tickets, she was going to go on the flight. It was Mr. Moorman's decision, though, that when you call the night before and say, hey, boss, I'm not going to be there tomorrow, that is an unscheduled, unplanned absence. In addition, that written warning was for chronic tardiness. It wasn't just. That written warning. Pardon me? The written warning that related to the flight change was for chronic tardiness. Chronic tardiness and the unscheduled absence. Did it say that? Yes. And after that written warning was given, Mr. Moorman and Ms. Walner had a conversation, and he said, you need to be at work by 8 o'clock, and she said, certainly I will. Immediately after receiving a final written warning for the misconduct that took place during leave, Ms. Walner immediately fell back into a rash of tardiness. She was late five times in seven days, and that's undisputed. But how late? She wasn't very late, right? Well, Your Honor, she was late anywhere between four and ten minutes on those days. Why shouldn't a jury be allowed to say, well, wait a minute, that seems pretextual? Because, Your Honor, it has to go to the nature of tardiness. First, she had been warned before the leave-it issue. She had just received a final written warning by which she was implored to get with the program, follow the rules, and then immediately there's this tardiness. Tardiness, you know, there's some kinds of misconduct that are serious in isolation, and there's other kinds of misconduct that become serious through accumulation, and I think tardiness is a quintessential example of the latter. But wasn't the tardiness here really de minimis? I mean, the videotape shows that she entered the building the first day at 8.04, which is four minutes late. The second day, 8.01, one minute late. Then 8.05, 8.08, and 8.02. The longest period of tardiness was eight minutes, but on the average, I think it was probably about two or three minutes. I mean, isn't that really a de minimis tardiness as opposed to anything substantial? Well, Your Honor, I would argue that when it comes to tardiness, there is no such thing as de minimis tardiness. I'm not even sure your clocks are accurate. I mean, when you're that close. Your Honor. I mean, my watch is a little different than the one I have back in the chambers. I mean, I can be off a couple of minutes here. Your Honor, when it comes to tardiness, it's the boss's watch that counts. Well, okay, but because it is so minimal, isn't that evidence that this reason given, because it is so minimal, may be protectual? I don't think so, Your Honor, and here's why. First of all, there were operational consequences to the tardiness. This is a highly regulated industry. It's a financial services firm. There's millions of dollars being traded every day on an instantaneous basis. The phones started ringing at 8. Professionally, though, it goes beyond just being a few minutes late. Tardiness is more than just being late. When it happens habitually, despite multiple warnings. The warnings that make the difference, isn't it? Yes, Your Honor, and the warnings that predated the FMLA leave. I'm talking about the final warning. You have a final warning. That's correct. There was a final warning. The final warning suggests that maybe you should get in before you're supposed to be there rather than after you're supposed to be there. To follow all of Hilliard-Lyon's policies and procedures, but what happens is over time that tardiness becomes a lack of professionalism towards your colleagues and a corrosive form of insubordination to your manager. In light of a final written warning that had just been given, it was clear that Ms. Walner's conduct was not going to improve and that it was time to act and just make good on the warnings that had been given both before, during, and after the leave. Their strongest evidence, I think, is this phone conversation where she was told that your FMLA isn't determinative, your disability period, disability insurance period is what we go by, and when that is out, you must report back irrespective of your FMLA claim or whatever that telephone conversation. Why isn't that evidence of an illegal motive to terminate when that was actually or allegedly said on the phone? Your Honor, as the court has picked up, the human resources representative was relying on the short-term disability carrier's estimate, which was based on medical information provided by the plaintiff, and it said she was going to return to work on September 22nd. So as part of their policies and procedures, they called to check and see, are you truly coming back this day or what is the situation? Was she told that she has to report after her disability was over? She said, according to the plaintiff, you need to return to work. Because your short-term disability has expired, you need to return to work, and she said, no, I don't. My doctor hasn't released me to return yet. And there was an argument, a heated argument, right? Allegedly to the plaintiff's testimony. What happened was this confusion, and I would add that according to the plaintiff, the HR representative was confused. She was not intentionally doing this. She was confused. But as a result of what should have been a good-faith professional interplay, Ms. Walner admittedly lost her temper, spoke in a voice beyond normal, and acted in a way that caused her husband to scream profanities into the telephone. But she's not her husband. I don't know if she can be terminated because of her husband's unprofessional conduct. I mean, the husband's not the employee. Your Honor, we think that Ms. Walner ought to be held responsible for acting in a way that would have prompted others to act in an unprofessional way. In any case, that conversation was one of two independent bases for the final written warning. The reason why she was terminated is because she was late five times in seven days when she returned. I'd like to address briefly, if the Court would like, the applicable burden-shifting tests for Ms. Walner's retaliatory discharge claims, which I believe are the only claims that are cognizable under the FMLA because of a lack of monetary damages. With regard to Ms. Walner's single motive framework, I think the McDonnell-Douglas framework using a retaliatory discharge prima facie case should be used whether the claim is technically recognized under the interference or the discrimination prongs of the FMLA pursuant to Seeger v. Cincinnati Bill. With respect to Ms. Walner's mixed motive theory, I believe the burden-shifting test used in Price Waterhouse is the correct test. That was the test that was cited and discussed in Hunter v. Valley View Local Schools, which is, as this Court knows, sort of the leading case on FMLA mixed motive in this circuit and beyond. Neither test, however, should overshadow the fact that this is a Rule 56 case and that the summary judgment standards that this Court is well aware of will govern the claims. If this Court has no further questions... I don't think so. Thank you, Counsel. Thank you, Your Honors. I would just like to address the retaliation claim and mostly the pretextual argument that was brought up. Hilliard-Lyons claims that she was fired just because of her tardiness. However, there are deposition testimony from Sharon Landgraf that says she was terminated for the final written warning and she was terminated for tardiness. Janet Harrison testifies that it was the final written warning, it was tardiness, it was unscheduled absences, it was unprofessional behavior. Those were the reasons why Ms. Walner was terminated. And Dennis Moorman, who was her supervisor, testified that it was the items that were contained in a document of deficiencies. And that is the reason why she was terminated. This document of deficiencies, I believe, is direct evidence of retaliation in this case. He clearly discusses her surgery. He clearly discusses the fact that he does not believe that she has kept Hilliard-Lyons informed or kept in contact with Hilliard-Lyons. And that was just not true. The reason why Ms. Walner's contact with Hilliard-Lyons became an issue was because Sharon Landgraf kept telling him she's returning to work on this date. She's returning to work on September 22nd. She's returning to work on October 2nd. And those dates were erroneous. The only date that Hilliard-Lyons knew of that she was going to return, the only date that was ever given by Ms. Walner to Hilliard-Lyons was the October 11th date. That was the date that her doctor told her that she could return unless she could return earlier. So to say that the testimony of Janet Harrison and Sharon Landgraf and this document of deficiencies only claim that she was terminated for tardiness, it's just not logical. It doesn't hold water. And I believe that a jury should be allowed to decide this case for Ms. Walner. There are facts that when you look at them in favor of her, I can get a reasonable jury to believe that Hilliard-Lyons violated her FMLA rights, and they'll fine for her. If you don't have any more questions. Thank you, counsel. I appreciate your argument. The case will be submitted. Please call the next case.